**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **RICHARD J. CLARSON, as Administrator of** | ) | |
| **Local No. 731, I.B. of T., Pension Fund and** | ) | |
| **Local No. 731, I.B. of T., Health and Welfare** | ) | |
| **Fund, LOCAL NO. 731, I.B. OF T., PENSION** | ) | |
| **FUND, and LOCAL NO. 731, I.B. of T.,** | ) | |
| **HEALTH AND WELFARE FUND,** | ) | **No. 20 C 1385** |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Judge Rebecca R. Pallmeyer** |
| **v.** | ) | |
| | ) | |
| **KEVIN RACZKOWSKI,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

In this ERISA case, two multiemployer benefit plans and their administrator seek delinquent fringe-benefit contributions that Union Recycling, a waste-hauling business, was allegedly required to make on behalf of its employees under a collective bargaining agreement ("CBA"). The only named defendant, Kevin Raczkowski, was the sole owner and officer of Union Recycling when it entered the CBA. Raczkowski was not party to the CBA in his personal capacity, and it turns out that the Illinois Secretary of State had dissolved the Union Recycling corporation several months before Raczkowski purported to sign the CBA on its behalf. Because Raczkowski acted under color of corporate authority when he signed the agreement, however, Plaintiffs contend that he can be held personally liable for Union Recycling's obligations to contribute to the plans. Raczkowski rejects this theory of personal liability, in part because he was unaware of the corporation's dissolution when he signed the CBA. He also disputes that his workers were "employees" for whom the CBA required contributions in the first place. In his view, the workers were independent contractors, or even volunteers, for whom no benefit contributions are owed.

Plaintiffs have moved for partial summary judgment against Raczkowski with respect to Union Recycling's alleged delinquent contributions to the plans from March 2018 to September 2019. For the reasons explained here, their motion [60] is denied.

## FACTUAL BACKGROUND[1]

### I.    The Parties

#### A.    Plaintiffs

Plaintiffs Local No. 731, I.B. of T., Pension Fund (the "Pension Fund") and Local No. 731, I.B. of T., Health and Welfare Fund (the "Welfare Fund") (together, the "Funds") are multiemployer benefit plans that are funded by contributions from more than 150 employers. (Pls.' SOF ¶ 1.) Employers contribute to the Funds pursuant to collective bargaining agreements they have entered into with Excavating, Grading, Asphalt, Private Scavengers, Automobile Salesroom Garage Attendants and Linen and Laundry Drivers Local Union No. 731, I.B. of T. ("Local 731"). (*Id.*)

The Funds are administered by their trustees (the "Trustees"), who are fiduciaries. (*Id.* ¶¶ 2–3.) Plaintiff Richard J. Clarson, the Administrator of the Funds, serves as an agent of the Trustees and a fiduciary of the Funds. (*Id.* ¶ 3.)

#### B.    Defendant

Defendant Kevin Raczkowski is an individual who has operated a waste-disposal business based in Lynwood, Illinois, since approximately 2006 (the "Disposal Business"). (Pls.' SOF ¶ 5.) The Disposal Business is a simple operation:  It delivers dumpsters to customers who request them, retrieves the dumpsters once the customers have filled them with waste, deposits the waste at third-party transfer stations, and returns the empty dumpsters to the Disposal Business's

---

[1]    The following facts come mainly from the parties' Local Rule 56.1 statements and related exhibits. (Pls.' Statement of Material Facts [61] (hereinafter "Pls.' SOF"); Def.'s Statement of Relevant Facts [76] (hereinafter "Def.'s SOF").)  The court has also accounted for each side's responsive statement of facts.   (Def.'s Resp. to Statement of Material Facts [75] (hereinafter "Def.'s SOFR"); Pls.' Response to Def.'s Statement of Add. Facts [78] (hereinafter "Pls.' SOFR").)  Below, the court addresses factual disputes where relevant.

property in Lynwood.[2]  (*Id.* ¶ 6.)  Raczkowski is the founder and owner of the Disposal Business; he performs virtually every role in the business and possesses all material knowledge of its operations.  (*Id.* ¶ 5; Dep. of Kevin Raczkowski, Ex. B to Pls.' SOF [61-1] (hereinafter "Raczkowski Dep.") at 9:11–10:10.)  He even resides on the Disposal Business's property.  (Raczkowski Dep. at 7:6–8, 23:7–9.)

### 1.    Union Recycling

Beginning around 2006, Raczkowski operated the Disposal Business through a solely-owned Illinois corporation named Union Recycling & Waste Services, Inc. ("Union Recycling"). (Pls.' SOF ¶ 5; *see also* Raczkowski Dep. at 8:23–9:3, 31:7–17.)   The corporation was involuntarily dissolved in November 2013, apparently due to Raczkowski's failure to pay required fees to the Illinois Secretary of State.[3]  (Pls.' SOF ¶¶ 10–11; *see also* Raczkowski Dep at 31:18–24, 34:24–35:5.)

At the time of the dissolution, Raczkowski was Union Recycling's registered agent, and the corporation's registered address was the Disposal Business's property in Lynwood.[4]  (Pls.' SOF ¶ 12.)  Despite his status as registered agent, Raczkowski testified that he never received notices from the Secretary of State about Union Recycling.  (Raczkowski Dep. at 34:2–10.)  In fact, Raczkowski cannot recall exactly when or how he learned of the corporation's dissolution.

---

[2]    A transfer station is a facility where waste is held, sorted, and processed before being taken to another destination, such as a landfill or recycling center.  (Pls.' SOF ¶ 7; Raczkowski Dep. at 21:21–22:3.)

[3]    The record is unclear about which type of fee Raczkowski failed to pay.  *See* 805 ILCS 5/15.05 (types of fees collected by the Secretary of State); *id.* § 5/12.35 (grounds for administrative dissolution of an Illinois corporation, including failure to pay required fees).

[4]    *See Corporation File Detail Report: Union Recycling & Waste Services, Inc.*, OFF. OF THE ILL. SEC'Y OF STATE, https://apps.ilsos.gov/corporatellc/CorporateLlcController (last visited Sept. 26, 2022) (to locate, click "Submit"; type "Union Recycling & Waste" in the search bar; click "Continue"; and select file number 64934805).

(Pls.' SOF ¶ 11.)  He testified that he may have become aware of the dissolution through a prior lawsuit brought against him by Plaintiffs.[5]  (*See* Raczkowski Dep at 35:2–17.)

After the corporation was dissolved in 2013, Raczkowski continued to operate the Disposal Business using the "Union Recycling" name.  In his deposition, he testified that his dumpsters, trucks, invoices, and letterhead were still branded with the corporate name.  (Pls.' SOF ¶¶ 14–17.)  And he testified that in his conversations related to the Disposal Business, he continues to refer to it as "Union Recycling."  (Raczkowski Dep. at 35:18–36:6.)

### 2.    Armor Recycling

During some portion of the time period relevant to this dispute, Raczkowski owned a second business, "Armor Recycling, Inc." ("Armor Recycling").[6]  (Def.'s SOF ¶ 7.)  Armor Recycling operated a transfer station in Harvey, Illinois.  (Raczkowski Dep. at 21:5–12.)  Thus, unlike Union Recycling, which primarily transported waste, Armor Recycling would hold, sort, and process such waste, with the goal of recovering salable materials.  (*See id.* at 22:4–20.)

Armor Recycling, like Union Recycling, was incorporated in 2006, and it was involuntarily dissolved in January 2014.[7]  Raczkowski has implied that even after the dissolution occurred, he continued to operate the transfer station business using the "Armor Recycling" name, just as he

---

[5]    Raczkowski pleaded in his Answer that "[t]his is the Funds' eighth lawsuit against Union Recycling & Waste [Services], Inc. and/or Defendant Kevin Raczkowski."  (Def.'s Answer [51] ¶ 23.)  The parties have provided no details about those prior lawsuits, and Raczkowski does not specify which lawsuit caused him to learn about Union Recycling's dissolution.

[6]    The record is unclear about when Armor Recycling stopped operating.  In his deposition in 2021, Raczkowski stated, in the past tense, that Armor Recycling "was a transfer station in Harvey, Illinois." (Raczkowski Dep. at 21:5–12.)  He noted that the property "still exist[s]" but implied that the business is now inactive, possibly due to lawsuits brought against him by Cook County and the Illinois Attorney General's Office.  (*See id.* at 21:13–16.)  The court discusses those lawsuits briefly further below.

[7]    *See Corporation File Detail Report: Armor Recycling, Inc.*, OFF. OF THE ILL. SEC'Y OF STATE, https://apps.ilsos.gov/corporatellc/CorporateLlcController (last visited Sept. 26, 2022) (to locate, click "Submit"; type "Armor Recycling" in the search bar; click "Continue"; and select file number 65027127).

did with Union Recycling. (*See, e.g.*, Def.'s SOF ¶ 6 (stating that Raczkowski's divorce in 2016, roughly two years after the corporate dissolution, negatively affected the "Armor Recycling" business).)

### 3. Prior Financial and Legal Trouble

Raczkowski has run into financial and legal trouble in the past, but the parties have provided few specific details.

"At one point," as Plaintiffs put it, transfer stations began rejecting waste that Union Recycling sought to unload at their facilities. (*See* Pls.' SOF ¶ 8.) According to Plaintiffs, these rejections occurred because a citation lien had been placed on Union Recycling's assets. (*Id.* (citing Raczkowski Dep. at 25:5–26:12).) According to Raczkowski, the rejections occurred because "the union put 'bricks' on [his] accounts" after a previous lawsuit between the parties.[8] (Def.'s SOF ¶ 4 (citing Raczkowski Dep. at 25:7–20); *see also* Def.'s SOFR ¶ 8.) In any event, the parties agree that Union Recycling, having been turned away by some number of transfer stations, eventually began to dump waste on its own property.[9] (Pls.' SOF ¶ 8.)

This dumping drew the attention of various government authorities, including Cook County and the Illinois Attorney General's Office, which responded with legal action against Raczkowski and/or Union Recycling. (*Id.*; Raczkowski Dep. at 25:21–26:12.) The parties provide few details about these proceedings, but they agree that Raczkowski was eventually ordered to remove the waste and clean up his property.[10] (Pls.' SOF ¶ 8; Def.'s SOF ¶ 9.)

---

[8] Neither party explains what the term "bricks" means in this context.

[9] Raczkowski says that when Union Recycling ran into difficulties with transfer stations, he initially planned to have Armor Recycling, his transfer station business, receive Union Recycling's waste. (Def.'s SOF ¶ 8.) For reasons not explained, however, that solution proved unworkable. (*See id.*)

[10] Whether the government orders mandating the cleanup of the Raczkowski's property were directed (1) at Raczkowski in his personal capacity, (2) at Union Recycling in its corporate capacity, or (3) both is not clear from the record.

## II.    The Collective Bargaining Agreement

### A.    Parties and Scope

On October 21, 2014, almost one year after the Union Recycling corporation was dissolved, Raczkowski entered into a collective bargaining agreement with Local 731 (the "CBA"), ostensibly on behalf of the corporation.[11]  (Pls.' SOF ¶ 19; *see also* Teamsters Local Union No. 731 Solid Waste and Recycling Industry Collective Bargaining Agreement, effective October 1, 2013 through September 2018 (Oct. 21, 2014), Ex. A-1 to Pls.' SOF [61-1] (hereinafter "CBA").)  The CBA identifies (1) "Union Recycling & Waste, Inc." as the "Employer," and (2) Raczkowcki as Union Recycling's "President."[12]  (Pls.' SOF ¶ 21; CBA at 1, 32.)  Raczkowcki signed the agreement on behalf of Union Recycling.  (CBA at 32.)  In a section entitled "Jurisdiction," the CBA states that the agreement covers work including "[c]ollection and disposal of ashes, refuse, rubbish, chemical waste, medical waste and hazardous waste; recycling collection and sorting; container maintenance and delivery; document destruction; street and parking lot sweeping, sprinkling and flushing and Transfer Station facility operations."  (Pls.' SOF ¶ 27; CBA art. XXX.)

### B.    Termination

The CBA was effective retroactively as of October 1, 2013, and it remained in force through at least September 30, 2018.  (Pls.' SOF ¶¶ 19, 30; Def.'s Answer [51] ¶ 10; CBA art. XXXII.)  By its terms, the CBA "continue[d] automatically on an annual basis [after September 30,

---

[11]    Raczkowski states that he "denies" these basic facts about the CBA, but he provides neither a citation to the record nor any explanation of his reasons—nor even a clarification of precisely what aspects of the statement he objects to.  (*See* Def.'s SOFR ¶ 19.)  Raczkowski admitted in his Answer that "Union Recycling entered into a collective bargaining agreement with Local 731 on October 1, 2013."  (*See* Def.'s Answer ¶ 10.)  Although the CBA introduced by Plaintiffs was not *entered* on that date, it was *effective* as of that date.  (*See* CBA at 1, 32.)  In his summary judgment response, Raczkowski has provided no reason why the document introduced by Plaintiffs should not be accepted as an authentic version of the agreement referred to in Raczkowski's Answer.

[12]    One small inconsistency not addressed by the parties:  The legal name of Raczkowski's corporation was "Union Recycling & Waste Services, Inc."  *See supra*.  The CBA, however, omits the word "Services."  (CBA at 1, 32.)

2018], unless written notice is provided by either [Union Recycling or Local 731] sixty (60) days prior to September 30, 2018, or September 30 of any subsequent year, as the case may be." (CBA art. XXXII; *see also* Pls.' SOF ¶ 30.)  Raczkowski claims that he provided Local 731 with such written notice on five separate occasions.  (Pls.' SOF ¶ 31.)  The earliest of these was September 2, 2018, when he mailed a termination notice to Local 731, and the others occurred in 2020.  (*Id.*)

As Plaintiffs point out (and Raczkowski does not dispute), the 60-day notice provision appears to require that, for a termination to take effect on September 30 of a given year, the notice must have been provided on or before the preceding August 1.  (Pls.' Mem. of Law [62] (hereinafter "Pls.' Mem.") at 6–7.)  Because Raczkowski's first alleged attempt to terminate the CBA occurred on September 2, 2018, it cannot have taken effect that year, so the CBA must have remained in effect until at least September 30, 2019.  (*Id.*)

### C.    Required Contributions

The CBA provides that Union Recycling "shall remit contributions" to the Welfare Fund and to the Pension Fund for each week for each "Employee" employed by Union Recycling during the corresponding calendar week.[13]  (Pls.' SOF ¶¶ 22–23; CBA art. IX, §§ 1–2.)  The terms "Employee" and "Employees" are defined as "the Employee or Employees in the classifications of work covered by this Agreement."  (Pls.' SOF ¶ 24; CBA art. II, § 3.)  The CBA includes several such classifications, none of which it defines: "Chauffeurs," "Swing Driver," "Semi," "Chauffeurs Operating Rubber Tire Loaders," "Municipal Recycling Chauffeurs/Yard Waste Two-Axle Roll-Off", "Helper", "Helper with CDL License," "Transfer/Trailer Chauffeur," "Journeyman Mechanic," "Apprentice Mechanic," "Preventive Maintenance Personnel (employees who assist in

---

[13]    The CBA provides that Union Recycling must make these weekly contributions "commencing with the sixtieth (60th) day of employment, provided the Employee has been employed for sixty (60) days or more for the Employer."  (CBA art. IX, §§ 1–2.)  The parties do not discuss this 60-day employment threshold.

maintenance operations)," "Sweeper," and "Parking Lot Sweeper." (Pls.' SOF ¶¶ 25–26; CBA art. VII, § 1.)

Initially, the CBA required Union Recycling to contribute $224.40 per Employee per week to the Welfare Fund and $278.20 per Employee per week to the Pension Fund. (Pls.' SOF ¶ 28; CBA art. IX, §§ 1–2.) Through 2017, the total amount of these contributions increased once annually, effective October 1, in the amount of $0.65 per hour. (Pls.' SOF ¶ 28; CBA art. IX, § 3.) The CBA empowered the "Local Union Executive Board" to determine how this $0.65 would be allocated between the Funds. (Pls.' SOF ¶ 28; CBA art. IX, § 3.) By October 1, 2017, the contribution rates had increased, as described above, to $282.40 per Employee per week to the Welfare Fund and $324.20 per Employee per week to the Pension Fund. (Pls.' SOF ¶ 29; Clarson Aff., Ex. A to Pls.' SOF [61-1] ¶ 8.)

### D. Other Related Documents

Under the CBA, Union Recycling is bound, further, to the Funds' respective trust agreements ("Trust Agreements"). (Pls.' SOF ¶ 47; CBA art. IX, § 11; *see also* Restated Agreement and Decl. of Tr. of the Local 731, I.B. of T., Private Scavengers and Garage Attendants Pension Tr. Fund (rev. Jan. 1, 2012), Ex. A-2 to Pls.' SOF [61-1] (hereinafter "Pension Fund Trust Agreement"); Am. and Restated Agreement and Decl. of Tr. of the Local 731, I.B. of T., Private Scavengers Health and Welfare Fund (Sept. 12, 2006), Ex. A-3 to Pls.' SOF [61-1] (hereinafter "Welfare Fund Trust Agreement").)

The Trust Agreements "each provide that their Trustees may adopt collection[] and audit procedures that shall be binding on the employers required to contribute to the Funds."[14] (*See*

---

[14] To support the proposition that the Trust Agreements bind Union Recycling to the Trustees' collection and audit procedures, Plaintiffs cite two lengthy sections of each Trust Agreement. (*See* Pls.' SOF ¶ 48 (citing Pension Fund Trust Agreement §§ 5.04, 15.01; and Welfare Fund Trust Agreement §§ 5.04, 15.01).) Section 15.01 of each Trust Agreement grants the respective Trustees the authority to "[m]ake such uniform rules and regulations as are consistent with and necessary for effectuating the provisions of this [Trust Agreement]." (*See* Pension Fund Trust Agreement § 15.01(B); Welfare Fund Trust Agreement § 15.01(B).) The court assumes that Plaintiffs rely on that broad language, though they do not specify.

Pls.' SOF ¶ 48.) On summary judgment, Plaintiffs have introduced two such documents: the "Collection Procedures" and the "Audit Policy." (*See* Pls.' SOF ¶¶ 49–50; Collection Procedures of Teamsters Local Union No. 731 Health/Welfare and Pension Funds, Ex. A-4 to Pls.' SOF [61-1] (hereinafter "Collection Procedures"); Payroll Compliance Audit Policy of Teamsters Local Union No. 731 Health/Welfare and Pension Funds, Ex. A-5 to Pls.' SOF [61-1] (hereinafter "Audit Policy").) Raczkowski disputes all facts derived from the Collection Procedures and Audit Policy because he objects to the documents as "hearsay," but he does not explain his reasoning. (*See* Def.'s SOFR ¶¶ 49–56.) To the extent that Raczkowski means to assert that Plaintiffs have not shown that the documents are authentic, the court finds that Federal Rule of Evidence 901 has been satisfied. (*See* Clarson Aff. ¶¶ 12–13 (attestation from the Funds' Administrator that the attached documents are the collection procedures and audit policy adopted by the Trustees).)

The Collection Procedures provide that if the Funds file a lawsuit against an Employer to collect delinquent contributions, the Employer must pay specified amounts in interest and liquidated damages, plus attorneys' fees and costs. (Pls.' SOF ¶¶ 51–53 (citing Collection Procedures §§ E, G).) The Trust Agreements contain similar provisions. (*Id.* (citing Pension Fund Trust Agreement § 5.04(E), (G); and Welfare Fund Trust Agreement § 5.04(B), (D)).)

The Audit Policy contains various record-keeping requirements for employers that contribute to the Funds. (*See* Audit Policy § G; *see also* Pls.' SOF § 54.) For example, an employer must retain either payroll journals or earnings records sufficient to show, for each of the employer's employees, the number of hours worked, the time periods in which work was performed, and the rate of pay. (Audit Policy § G(2)–(3).) Employers also must maintain records of amounts paid by the employer to independent contractors; daily time records of employees; and employee personnel files. (*Id.* § G(7), (8), (11).) Such records "shall be produced for inspection and copying by an Auditor of the Benefit Funds upon written request" to the employer. (*Id.* § G.)

In the event that an employer "fails to maintain or make available" the records required under the Audit Policy, the Policy sets forth procedures for resolving disputes about the amounts owed, including specific evidentiary rules. (*Id.* §§ H–I.) Plaintiffs highlight a few of these rules. First, the employer "shall bear the burden of proof with respect to the exclusion of any employee from coverage by the collective bargaining agreement with the Union."[15] (*Id.* § H; Pls.' SOF ¶ 55.) Second:

> Affidavits solicited and obtained ex parte by an Employer's Representative from employees, for which there is no corroborative evidence in the form of records maintained in the ordinary course of business, shall not be sufficient to meet the Employer's burden of proof.

(Audit Policy § H; Pls.' Reply Mem. [77] at 6–7.) And third:

> There shall also be a rebuttable presumption concerning the hourly rate and number of hours worked as follows: (a) that the employee was paid the current hourly rate for the applicable work classification contained in the collective bargaining agreement if no record of hourly wage rates was made by the Employer, and/or (b) that the employee worked fifty (50) hours per week if no record of the number of hours was maintained; whichever of these presumptions results in the higher amount of contributions shall be applied.

(Audit Policy § I; Pls.' SOF ¶ 56.)

## III.    The Alleged Delinquent Contributions

Union Recycling made no contributions to the Funds from March 2018 through September 2020. (Pls.' SOF ¶ 32.) The parties agree that eight individuals performed some amount of work for Raczkowski during this period, but they dispute the nature of the work. (*See* Def.'s SOFR ¶¶ 33–38; Pls.' SOFR ¶¶ 11–16.) Raczkowski contends that none of the eight workers were "employees" of Union Recycling. (Pls.' SOF ¶ 39; Def.'s Resp. [74] at 4–6.) Plaintiffs disagree. (Pls.' Mem. at 9–13.) The evidence on this question is mixed. The first piece of evidence is Raczkowski's August 2020 response to an interrogatory asking him to "identify each individual

---

[15]    Put another way, "there shall be a rebuttable presumption that any employee listed as a possible member of the Teamsters Local 731 bargaining unit by an auditor or attorney representing the Benefit Funds was a member of the Local 731 bargaining unit." (Audit Policy § I; *see also* Pls.' SOF ¶ 55.)

who worked as an employee or independent contractor for Union Recycling" during the relevant time period, including the hours the individual worked and the job duties they performed. (*See* Def. Kevin Raczkowski's Resps. to Pls.' First Set of Interrogs., Ex. D to Pls.' SOF [61-1] (hereinafter "Interrog. Resp.") at 5–9.) Raczkowski's response, submitted through counsel, listed eight "acquaintances and friends who assist him and Union Recycling on a voluntary basis, on an independent contractor basis, or on other non-employee bases." (*Id.*) Those individuals are Claude Berrin, Phillip Berrin, Bobby Guevera, Steve Hawkinson, Gary Kellmans, Tim Kellmans, Bob Kuolper, and Steve White (the "Workers"). (*Id.* at 5–9.)

In October 2020, shortly after submitting the interrogatory response, Raczkowski's lawyers withdrew from the case [33, 34, 36]. A few months later, Plaintiffs propounded requests for admission seeking more information about the arrangement between Union Recycling, Raczkowski, and the Workers (referred to collectively rather than as individuals). (*See* Def. Kevin Raczkowski's Resps. to Pls.' First Set of Reqs. for Admis., Ex. E to Pls.' SOF [61-1] (hereinafter "RFA Resp.") at 2–3.) Raczkowski, proceeding pro se, responded to the requests in March 2021. (*Id.* at 5)

Then, in November 2021, as part of his opposition to Plaintiffs' motion for partial summary judgment, Raczkowski submitted affidavits from seven of the eight Workers, described below. (*See* Claude Berrin Aff., Ex. to DSOAF [76]; Aff. of Phillip Berrin, Ex. to DSOAF [76]; Kuolper Aff., Ex. to DSOAF [76]; Hawkinson Aff., Ex. to DSOAF [76]; White Aff., Ex. to DSOAF [76]; Tim Kellmans Aff., Ex. to DSOAF [76]; Gary Kellmans Aff., Ex. to DSOAF [76].) Raczkowski was still proceeding pro se when he solicited and submitted these affidavits.

As explained in more detail below, Raczkowski's responses to the requests for admission are largely inconsistent with the facts presented in his interrogatory answer and in the Workers' affidavits.

### A.     Interrogatory Response and Affidavits

#### 1.     Tim and Gary Kellmans

In Raczkowski's interrogatory response, he explained that the work of brothers Tim and Gary Kellmans consisted of "low-skill cleaning" of Raczkowski's real property.[16]  (Interrog. Resp. at 5.)  Raczkowski described the work arrangement as follows:

> Neither Defendant nor Union Recycling pay the Kellmans hourly wages; the Kellmans have no set schedule with Union Recycling; the Kellmans have no mandated hours; the Kellmans participate in no "team meetings" with Defendant or Union Recycling; the Kellmans engage in no formal review process with Defendant or Union Recycling; Defendant has never guaranteed any future work for the Kellmans; and neither Defendant nor Union Recycling believe the Kellmans to be employees of Union Recycling.

(*Id.* at 5–6.)  And he stated that he would compensate the Kellmanses roughly $100 per day of work, plus the occasional lunch.  (*Id.* at 5.)

In their affidavits, both Tim and Gary Kellmans described their work as "occasional day labor tasks."  (Tim Kellmans Aff. ¶ 3; Gary Kellmans Aff. ¶ 3.)  As they explained it, they "offered to help" Raczkowski clean up his property after he had been ordered to do so.  (Tim Kellmans Aff. ¶ 4; Gary Kellmans Aff. ¶ 4.)  Raczkowski "would usually buy [them] lunch" and "often paid [them] when he had money."  (Tim Kellmans Aff. ¶ 4; Gary Kellmans Aff. ¶ 4.)  Both individuals stated that "Kevin did not direct [their] hours or [their] tasks," and that they "would work if [they] felt like it and would not work when [they] felt like it."  (Tim Kellmans Aff. ¶ 5; Gary Kellmans Aff. ¶ 5.)  The Kellmanses' work required no tools other than gloves, which they provided themselves.  (Tim Kellmans Aff. ¶ 6; Gary Kellmans Aff. ¶ 6.)   During the relevant time frame, each of them performed day labor tasks for individuals other than Raczkowski.  (Tim Kellmans Aff. ¶ 7; Gary Kellmans Aff. ¶ 7.)

---

[16]     During his deposition, Raczkowski explained that the Kellmanses' main task was to sort material based on type (e.g., brick, paper, or steel).  (Raczkowski Dep. at 29:12–30:1.)

### 2. Steve White and Bobby Guevera

In Raczkowski's interrogatory response, he explained that the work of Steve White and Bobby Guevera, each of whom Raczkowski described as a "close personal friend," consisted of driving and cleaning Raczkowski's real property on a "project-by-project basis." (Interrog. Resp. at 6.) Raczkowski described White's and Guevera's work arrangement the same way he described the Kellmanses': Neither White nor Guevera was paid "hourly wages"; neither had a "set schedule" or "mandated hours"; neither participated in "team meetings"; neither engaged in a "formal review process"; Raczkowski never "guaranteed any future work" to either White or Guevera; and neither Raczkowski nor Union Recycling believed that either White or Guevera was an "employee" of Union Recycling. (*Id.* at 6–7.) Raczkowski explained that these two individuals were "not paid every time [they] assist[] Defendant and Union Recycling, as [their] assistance is at times voluntary." (*Id.*) When these individuals were "periodically paid," Raczkowski gave them roughly $50 to $100 per day of work, plus the occasional lunch. (*Id.* at 6–7.)

In an affidavit, White described his work as "occasional day labor tasks," plus occasionally "pick[ing] up materials using a truck owned by Kevin Raczkowski." (White Aff. ¶ 4.) White stated that "[n]either Kevin nor [he] kept track of the time that [he] spent working at the property or driving a truck"; that he "would work when [he] wanted to work and not work when [he] didn't want to work"; and that "Kevin would offer to pay me when he could afford it but I would never take money from him." (*Id.*) White reported that he was "employed full-time" (for an enterprise other than Union Recycling). (*Id.* ¶¶ 2–3.)

Raczkowski did not submit an affidavit from Guevera.

### 3. Steve Hawkinson

In Raczkowski's interrogatory response, he described Steve Hawkinson, another "close personal friend," as "a full-time employee of a different company" (i.e., a company other than Union Recycling). (Interrog. Resp. at 7.) Raczkowski explained that he "gave Mr. Hawkinson permission to use [Raczkowski's] real property in exchange for Mr. Hawkinson's volunteered

favors on odd-jobs around that property, including but not limited to fixing and welding trucks, dumpsters, and flat tires[;] occasional driving of trucks[;] and cleaning Defendant's real property." (*Id.*)  Raczkowski stated that Hawkinson performed these tasks "at random intervals and on his own time."  (*Id.*)  And Raczkowski noted that neither he nor Union Recycling paid Hawkinson "any wages" in exchange for completing the tasks described above.  (*Id.*)  Raczkowski summarized Hawkinson's work arrangement essentially the same way he summarized the Kellmanses', White's, and Guevera's:  It involved no "set schedule" or "mandated hours"; no "team meetings"; no "review process"; no guarantee of Hawkinson's future use of Raczkowski's property; and no understanding, on the part of either Raczkowski or Union Recycling, that Hawkinson was an "employee" of Union Recycling.  (*Id.* at 7–8.)

Hawkinson's affidavit confirmed that Hawkinson owns and operates his own small business, for which he works "full-time."  (Hawkinson Aff. ¶ 3.)  In addition to that work, he "perform[s] repair work on trucks on a part-time basis," sometimes using Raczkowski's property to do so.  (*Id.* ¶ 4.)  Hawkinson explained that the trucks he repairs are primarily not owned by Raczkowski or Union Recycling; that he obtained the customers through his own efforts; that he does not share this income with Raczkowski; and that he utilizes his own tools and equipment for repair work.  (*Id.*)  Hawkinson stores some of his tools and equipment on Raczkowski's property, but he "consider[s] the space where [he] kept [his] tools and equipment on the property to be [his] space and not that of Kevin Raczkowski or Union Recycling," and "[n]either Kevin nor any other individual would have the right to add, remove, use or otherwise tamper with any tools, equipment or customer property within my designated area of the property."  (*Id.* ¶ 5.)

In exchange for his rent-free use of Raczkowski's property, and based on their long-term friendship, Hawkinson would sometimes help Raczkowski by repairing one of his trucks.  (*Id.* ¶¶ 6–7.)  Hawkinson would also occasionally help Raczkowski clean up his property "if [he] had time"—work he viewed as "lend[ing] a hand" to a friend.  (*Id.* ¶¶ 8–9.)  Hawkinson "did not receive payment for this and did not expect payment for it."  (*Id.* ¶ 9.)

14

### 4.      Claude and Phillip Berrin

In his interrogatory response, Raczkowski stated that brothers Claude and Phillip Berrin "own and drive a hauling truck which neither [Raczkowski] nor Union Recycling owns."  (Interrog. Resp. at 8.)  Raczkowski explained that he allows the Berrins to park their truck on Raczkowski's real property without paying rent; in exchange, the Berrins use that truck to pick up and transport dumpsters for Raczkowski.  (*Id.*)  According to Raczkowski, the Berrins performed these tasks "at random intervals and on their own time," and "[n]either [Raczkowski] nor Union Recycling pays the Berrins any wages in exchange for the tasks detailed above." (*Id.*)  As he did for the individuals described above, Raczkowski stated that his arrangement with the Berrins involved no "set schedule" or "mandated hours"; no "team meetings"; no "review process"; no guarantee of the Berrins' future use of Raczkowski's property; and no understanding, on the part of either Raczkowski or Union Recycling, that the individuals were "employees" of Union Recycling.  (*Id.*)

In their affidavits, Claude and Phillip Berrins confirmed that they "co-own a trucking company" that "haul[s] freight, dumpsters and other items" for various customers.  (Claude Berrin Aff. ¶ 4; Phillip Berrin Aff. ¶ 4.)  The Berrins stated that Raczkowski would occasionally ask them to use their truck to pick up one of his dumpsters.  (Claude Berrin Aff. ¶ 5; Phillip Berrin ¶ 5.)  When they did so, they "would be paid directly by the customer[,] and Kevin Raczkowski would not be paid for that service."  (Claude Berrin Aff. ¶ 5; Phillip Berrin Aff. ¶ 5.)  They each "considered these transactions as referrals, not as working for Kevin Raczkowski or Union Recycling." (Claude Berrin Aff. ¶ 5; Phillip Berrin Aff. ¶ 5.)  The Berrins reported that they paid their own insurance, maintenance, and other costs for their truck, which they would occasionally use to perform tasks for individuals or entities other than Kevin Raczkowski and Union Recycling. (Claude Berrin Aff. ¶ 6; Phillip Berrin Aff. ¶ 6.)

### 5.      Bob Kuolper

In Raczkowski's interrogatory response, he explained that Bob Kuolper, another "close personal friend," is "in the business of automotive sales."  (Interrog. Resp. at 8.)  Raczkowski

15

explained that he allowed Kuolper to store cars on Raczkowski's property. (*Id.*) In exchange, Kuolper completed "odd-job favors" for Raczkowski, including driving, picking up recycling boxes, and cleaning Raczkowski's real property. (*Id.*) Raczkowski explained that Kuolper performed these tasks "at random intervals and on his own time," and that neither Raczkowski nor Union Recycling pays Kuolper "any wages" in exchange for his work. (*Id.* at 8–9.) Raczkowski's response concluded by noting that his arrangement with Kuolper involved no "set schedule" or "mandated hours"; no "team meetings"; no "formal review process"; no guarantee of Kuolper's future use of Raczkowski's property; and no understanding, on the part of either Raczkowski or Union Recycling, that Kuolper was an "employee" of Union Recycling." (*Id.* at 9.)

Kuolper's affidavit, too, confirmed Raczkowski's account. Kuolper explained that he "own[s] and operate[s] a small business selling automobiles and work[s] at this business full-time." (Kuolper Aff. ¶ 3.) Kuolper sometimes stores cars on Raczkowski's property. (*Id.* ¶ 4.) He "considered the space where [he] stored vehicles and equipment on the property to be [his] space and not that of Kevin Raczkowski or Union Recycling," and asserted that "[n]either Kevin nor any other individual would have the right to add, remove, use or otherwise tamper with any vehicles, equipment or other property within [his] designated area of the property." (*Id.* ¶ 5.) In exchange for his rent-free use of Raczkowski's property, Kuolper "would often allow Kevin to drive a used car which was owned by [his] auto dealership." (*Id.* ¶ 6.) He would also occasionally help Raczkowski clean up his property "if [he] had time"—work he viewed as "lend[ing] a hand" to a friend. (*Id.* ¶ 9.) Hawkinson "did not receive payment for this and did not expect payment for it." (*Id.*)

### B.    Responses to Requests for Admission

In his March 2021 responses to Plaintiffs' first set of requests for admission, Raczkowski admitted each of the following statements, which were drafted by Plaintiffs:

- "Union Recycling or Raczkowski directed the Workers with respect to the specific tasks that they would perform."

- "Union Recycling or Raczkowski scheduled the dates, times, or both that the Workers would perform tasks."

- "[T]he Workers do not operate independent businesses that Union Recycling or Raczkowski has engaged."

- "[T]he Workers have not provided their own equipment, supplies, tools, fees, or licenses that are needed to do work for Union Recycling."

- "Union Recycling or Raczkowski expected the Workers to repeatedly perform tasks for Union Recycling."

- "Union Recycling or Raczkowski expected the Workers to perform tasks for Union Recycling for an indefinite period of time."

- "[N]either Union Recycling nor Raczkowski issued any Form IRS 1099 to the Workers."

(RFA Resp. ¶¶ 5–10, 19.)

## LEGAL STANDARD

The standards that govern a motion for summary judgment are familiar. The court should grant such a motion only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Courts draw all inferences in favor of the nonmoving party, but a nonmovant is "not entitled to the benefit of inferences that are supported only by speculation or conjecture." *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, "the nonmoving party must set forth specific facts showing a genuine issue for trial." *Abrego v. Wilkie*, 907 F.3d 1004, 1011–12 (7th Cir. 2018) (citing *Matsushita*, 475 U.S. at 587). "If there is no triable issue of fact on even one essential element of the nonmovant's case, summary judgment is appropriate." *Boss*, 816 F.3d at 916.

This district's Local Rule 56.1 requires a party moving for summary judgment to file a statement of material facts, consisting of "concise numbered paragraphs" supported by citations

to "specific evidentiary material." L.R. 56.1(a)(2), (d). The nonmovant must file a responsive statement that admits or disputes each asserted fact. L.R. 56.1(b)(2), (e). "A general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial." *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000); *see also* L.R. 56.1(e)(3). If a statement is not rebutted properly, it may be deemed admitted. *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009).

District courts have "considerable discretion in interpreting and applying their local rules," and they are entitled to construe pro se submissions leniently. *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 548–49 (7th Cir. 2017); *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016). While district courts may choose to demand "strict compliance" with the rules, *Cracco*, 559 F.3d at 632, they may also "exercise their discretion in a more lenient direction," *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013) (noting that "litigants have no right to demand strict enforcement of local rules"). "[U]nless the district court 'enforces (or relaxes) the rules unequally as between the parties,' the decision 'to overlook any transgression of the local rules is left to the district court's discretion." *Id.* (alterations omitted) (quoting *Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011).

In several instances, Plaintiffs point out Raczkowski's failure to cite the record when disputing Plaintiffs' factual assertions. Notwithstanding Raczkowski's noncompliance with the local rules, the court has declined to summarily deem those facts admitted.[17] Instead, the court has reviewed the underlying evidence itself, adhering to the rule that a movant's facts, even if not properly disputed, should be deemed admitted only to the extent they are "supported by evidence

---

[17] Perhaps by way of explanation for Raczkowski's failures, the court notes that Plaintiffs appear to have violated Local Rule 56.2, which requires a party moving for summary judgment against an unrepresented party to serve the nonmovant with a notice explaining the court's procedures on summary judgment. *Ohio Nat'l Life Assur. Corp. v. Davis*, 803 F.3d 904, 906 (7th Cir. 2015). The rule requires the movant to file this notice along with a certificate of service—something Plaintiffs never did.

in the record." *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012). The movant "must still demonstrate that it is entitled to judgment as a matter of law." *Id.* In making this determination, the court views the facts in the light most favorable to the nonmovant and draws all reasonable inferences in the movant's favor. *Id.*

## DISCUSSION

The Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 *et seq.*, "imposes an affirmative obligation on employers to make contributions to multiemployer benefits plans in accordance with the terms" of the agreements governing those plans. *RiverStone Grp., Inc. v. Midwest Operating Eng'rs Fringe Benefit Funds*, 33 F.4th 424, 430 (7th Cir. 2022) (citing 29 U.S.C. § 1145).

ERISA authorizes a plan's fiduciaries to bring a civil action to enforce § 1145. *See* 29 U.S.C. § 1132(a)(3), (g); *see also Line Constr. Benefit Fund v. Allied Elec. Contractors, Inc.*, 591 F.3d 576, 579–80 (7th Cir. 2010) (holding that a multiemployer plan is a fiduciary for purposes of a § 1132 enforcement action); 29 U.S.C. § 1002(3), (37) (defining "multiemployer plan"). Other provisions of ERISA, as well as the Labor Management Relations Act (LMRA), 29 U.S.C. §§ 141 *et seq.*, supply this court with jurisdiction. *See* 29 U.S.C. § 1132(e)–(f); *id.* § 185(c).

Plaintiffs have moved for partial summary judgment against Raczkowski with respect to Union Recycling's alleged delinquent contributions to the Funds from March 2018 to September 2019.[18] (Pls.' Mem. at 1.) Plaintiffs contend that the CBA required Union Recycling to make contributions for the Workers during this period. (*Id.* at 9–13.) According to Plaintiffs' calculations, these contributions total $215,268.80 owed to the Pension Fund and an additional $187,513.60

---

[18] Plaintiffs seeks alleged delinquent contributions all the way up to September 2020. They concede, however, that Raczkowski's liability for contributions from after September 2019 depends on a disputed issue of fact related to Raczkowski's alleged attempts to terminate the CBA. (*See* Pls.' Mot. [60] ¶ 2; Pls.' Mem. at 1.)

owed to the Welfare Fund—before 20% liquidated damages or 1% monthly interest are added. (*Id.* at 14–15.)

The court's analysis proceeds in two steps. First, the court discusses whether Raczkowski can be held personally liable for Union Recycling's obligations under the CBA. After answering that question affirmatively, the court discusses whether the CBA obligated Union Recycling to make the contributions that Plaintiffs claim are delinquent.

## I.     Raczkowski's Personal Liability for Union Recycling's Obligations

The threshold issue is whether Raczkowski, an individual who was not a party to the CBA, can be held personally liable for Union Recycling's obligations under the agreement.

Ordinarily, ERISA's requirement of strict compliance with a collective bargaining agreement, 29 U.S.C. § 1145, applies only to an "employer" that is contractually obligated under the plan. *Levit v. Ingersoll Rand Fin. Corp.*, 874 F.2d 1186, 1192–93 (7th Cir. 1989). In this case, the employer was Union Recycling—not Raczkowski, who merely signed the CBA in his capacity as Union Recycling's "President." But the Seventh Circuit has explained that a corporate officer "who does not make a contractual commitment to a pension or welfare plan still could be personally liable, to the extent he is liable for general corporate debts under state corporate law." *Id.* at 1194.

Under Illinois law, "[a] corporation exists separately from its shareholders, officers, directors and related corporations, and those individuals and entities ordinarily are not subject to corporate liabilities." *Laborers' Pension Fund v. Lay-Com, Inc.*, 580 F.3d 602, 610 (7th Cir. 2009) (citing *Fontana v. TLD Builders, Inc.*, 362 Ill. App. 3d 491, 840 N.E.2d 767 (2d Dist. 2005)). But there are notable exceptions, as the Seventh Circuit implied in *Levit*. *See Levit*, 874 F.2d at 1193–94 (discussing corporate-veil piercing). Plaintiffs' theory of liability rests on section 3.20 of the Business Corporation Act of 1983 ("BCA"), which states that "[a]ll persons who assume to exercise corporate powers without authority so to do shall be jointly and severally liable for all debts and liabilities incurred or arising as a result thereof." 805 ILCS 5/3.20. In Plaintiffs' view,

Raczkowski is liable for Union Recycling's obligations under the CBA because he "assume[d] to exercise corporate powers without authority" when he purported to enter Union Recycling into the CBA even after it had been dissolved. (Pls.' Mem. at 7–9.)

Illinois courts have held that section 3.20 liability may extend to "an officer of a corporation dissolved for nonpayment of franchise taxes, who enters into contracts on behalf of the corporation after dissolution."[19] *H & H Press, Inc. v. Axelrod*, 265 Ill. App. 3d 670, 680, 638 N.E.2d 333, 340 (1st Dist. 1994). But the party seeking to establish the officer's liability must establish that "at the time [the officer] enters the contract, he knows, or because of his position should know, of the dissolution." *Steve's Equip. Serv., Inc. v. Riebrandt*, 121 Ill. App. 3d 66, 70–71, 459 N.E.2d 21, 24–25 (2nd Dist. 1984).

A defendant's actual or constructive knowledge of corporate dissolution is an issue of fact. In *Steve's Equipment*, for example, an appellate court reversed a judgment against the defendant, and remanded for further proceedings, where the trial court had not adequately discussed the defendant's knowledge. *Steve's Equip*, 121 Ill. App. 3d at 71, 459 N.E.2d at 25. In another case, *H & H Press*, an appellate court reversed a judgment against the defendant, who was a corporate vice president, where her "uncontroverted testimony established that she was unaware of the dissolution of the corporation until after plaintiffs filed the instant action," and the record did not "include any documentary or other evidence that [she] was sent notice of the dissolution by the Secretary of State." *H & H Press*, 265 Ill. App. 3d at 680, 638 N.E.2d at 340; *see also Richmond Wholesale Meat Co. v. Hughes*, 625 F. Supp. 584, 589–90 (N.D. Ill. 1985) (denying summary judgment where the plaintiff introduced evidence that the Secretary of State had sent a dissolution notice but the defendant denied that he had received it).

---

[19]    As noted above, the record leaves unclear whether Union Recycling was dissolved because it failed to pay franchise taxes or some other type of fee. *See* 805 ILCS 5/12.35; *id.* § 5/15.05

There are similar factual ambiguities in this case. It is unclear when Raczkowski became aware that Union Recycling had been dissolved (Pls.' SOF ¶ 11); Plaintiffs have submitted no evidence that the Secretary of State notified him of the dissolution; and for his part, Raczkowski denies ever having received such notice (Raczkowski Dep. at 34:2–10). But these factual ambiguities do not necessarily mark the end of the story, even on summary judgment. Several courts have found, as a matter of law, that an individual had constructive notice of a corporation's dissolution given the nature of their role in the corporate structure.

For example, a court in this district held that individual was liable for the delinquent pension-fund contributions required to be made by his dissolved corporation because he was the "sole shareholder, director and officer." *See Chi. Tile Inst. Welfare Fund v. Hermansen*, No. 94 C 7216, 1996 WL 131800, at *4 (N.D. Ill. Mar. 21, 1996) ("Hermansen should have known of the statutory requirements that an annual report be filed and that franchise taxes be paid, and that failure to satisfy these requirements would result in dissolution."). Other cases have held similarly. *See, e.g.*, *Affiliated Cap. Corp. v. Buck*, 886 F. Supp. 647, 649 (N.D. Ill. 1995) ("As president of MSHI, Mr. Buck presumably knew or at a minimum should have known that MSHI had been dissolved."); *Se. Opthalmic Instruments, Inc. v. Metzl*, No. 89 C 2930, 1989 WL 117973, at *2 (N.D. Ill. Sept. 27, 1989) ("As a matter of law Metzl, as president of Jameco, should have known that his company had been dissolved.").

Consistent with these authorities, the court concludes that Raczkowski had constructive notice of Union Recycling's dissolution. Raczkowski was not merely the sole owner and officer of the Disposal Business, with virtually total control over its operations. (Pls.' SOF ¶ 5; Raczkowski Dep. at 9:11–10:10.) He was also Union Recycling's registered agent at the time it was dissolved, which, as he admitted, meant that he was responsible for receiving government notices on behalf of the corporation. (Pls.' SOF ¶¶ 12–13.)

The court concludes that because Raczkowski should have known about Union Recycling's dissolution at the time he entered into the CBA, he may be held liable for Union Recycling's obligations under the agreement. *See* 805 ILCS 5/3.20.

## II.    Union Recycling's Obligations Under the CBA

Next, the court must review the language of the CBA, and the relationship between Union Recycling and the Workers, to determine whether the CBA required Union Recycling to make the contributions that Plaintiffs allege are delinquent.

The CBA requires Union Recycling to make contributions to the Welfare Fund and to the Pension Fund for each week for each "Employee" employed by Union Recycling during the corresponding calendar week. (Pls.' SOF ¶¶ 22–23; CBA art. IX, §§ 1–2.) To qualify as an "Employee," a worker must fit within one of the classifications enumerated in the agreement. (*See* Pls.' SOF ¶¶ 24–26; CBA art. II, § 3; *id.* art. VII, § 1.) Plaintiffs contend that each Worker was a "Helper" or else served in one of the driving-related roles. (Pls.' Mem. at 9–12.)

Raczkowski does not appear to dispute that all eight Workers were performing types of work that fit within the scope of the CBA. He contends, however, that the Workers were not working for Union Recycling—the Disposal Business—at all. In his view, they were working either for Raczkowski in his personal capacity or for Raczkowski's transfer station business, Armor Recycling. As he puts it, "[t]he duty to clean up the property was legally and ethically a personal duty to Raczkowski or Armor Recycling, Inc. and was not the responsibility of Union Waste and Recycling Services, Inc." (Def.'s Resp. at 3.)

Raczkowski's argument is unpersuasive. For one thing, Raczkowski identified the Workers in response to an interrogatory asking him to name "each individual who worked as an employee or independent contractor for Union Recycling." (*See* Interrog. Resp. at 5.) Rackowski has not withdrawn that interrogatory answer or suggested that it is not truthful. Second, the record does not support Raczkowski's implication that all of the work in question was performed solely in response to government orders directed at Raczkowski or at Armor Recycling. Perhaps some

of the clean-up work served Raczkowski only in his attempts at compliance; the court cannot validate that theory with so little information about the contents of the orders.[20]  But in any event, at least six Workers did far more than simply "clean up the property."  The court finds that their driving tasks, for example, fall within the undisputed scope of Union Recycling's business: delivering dumpsters to customers who request them, retrieving the dumpsters once the customers have filled them with waste, depositing the waste at third-party transfer stations, and returning the empty dumpsters to Union Recycling's property in Lynwood.  Fixing Raczkowski's trucks, which are used in each of those steps, would also represent work for the Union Recycling.  The court thus concludes that the Workers performed at least some work for Union Recycling, not just for Raczkowski personally or for Armor Recycling.

Although the court has now concluded that the Workers performed work for Union Recycling that fell within the scope of the CBA, Plaintiffs must still establish that the Workers were Union Recycling's "employees" rather than its independent contractors.[21]  To determine whether an employer–employee relationship exists for ERISA purposes, the court relies on the Seventh

---

[20]     The record certainly does not support Raczkowski's argument with respect to Armor Recycling.  Raczkowski testified in his deposition that Armor Recycling was "a transfer station in Harvey, Illinois."  (Raczkowski Dep. at 21:5–12.)  He cannot reasonably argue, on this record, that Tim and Gary Kellmans were working for Armor Recycling when they cleaned up Raczkowski's real property in Lynwood, Illinois—the headquarters of Union Recycling.

[21]     The CBA itself does not expressly distinguish between employees and independent contractors, but Plaintiffs seem to concede that Union Recycling would not be obligated to make contributions on the Workers' behalf if they were merely independent contractors.  (*See* Pls.' Mem. at 12–13.)  *See Mazzei v. Rock N Around Trucking, Inc.*, 246 F.3d 956, 961–63 (7th Cir. 2001) (explaining that the LMRA "permits employer trust fund contributions, regardless of the employment status of the employer's workers, when the amounts of such contributions are measured by the number of hours worked by that employer's workers as opposed to being given simply 'on behalf of' or 'for the benefit of' the employer's workers" (citing 29 U.S.C. § 186(a)(1), (c)(5); *Walsh v. Schlecht*, 429 U.S. 401, 407–10 (1977))).  Because the CBA provides for contributions on behalf of each worker in fixed weekly amounts— amounts that are not tied to the number of hours worked—the workers must be employees, not independent contractors, to avoid a conflict with the LMRA.

Circuit's five-factor test.[22]  *See Mazzei v. Rock N Around Trucking, Inc.*, 246 F.3d 956, 963 (7th Cir. 2001) (citing *Knight v. United Farm Bureau Mut. Ins.*, 950 F.2d 377, 378–79 (7th Cir. 1991)).

> The five factors are drawn from traditional principles of agency law:

> (1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations.

*Id.*; *see also Frey v. Coleman*, 903 F.3d 671, 676 (7th Cir. 2018).

Plaintiffs contend that "[n]one of the factors suggest that [Union Recycling's] workers are independent contractors rather than employees."  (Pls.' Mem. at 12.)  For evidentiary support, they rely almost exclusively on Raczkowski's March 2021 responses to Plaintiffs' first set of requests for admission.  (*Id.* at 12–13 (citing Pls.' SOF ¶¶ 40–45); Pls.' SOF ¶¶ 40–45 (citing RFA Resp. at 2–3).)  Some of those admissions map neatly onto the Seventh Circuit's five factors, and they do tend to favor the conclusion that there was an employer–employee relationship between Union Recycling and the Workers.  Raczkowski admitted, for example, that "Union Recycling or Raczkowski directed the Workers with respect to the specific tasks that they would perform" (factor 1); that "the Workers have not provided their own equipment, supplies, tools, fees, or licenses that are needed to do work for Union Recycling" (factor 3); that "neither Union Recycling nor Raczkowski issued any Form IRS 1099 to the Workers" (factor 4); and that "Union Recycling or Raczkowski expected the Workers to repeatedly perform tasks for Union Recycling" (factor 5). (RFA Resp. ¶¶ 5–10, 19.)

Plaintiffs say the court must treat these answers as "judicial admissions."  (Pls.' Reply Mem. at 3–4.)  Unlike a routine evidentiary admission, which "may be controverted or explained

---

[22]     The Seventh Circuit's five-factor test is the "essential equivalent" of the inquiry called for by the Supreme Court, which identified twelve factors as relevant.  *See Frey v. Coleman*, 903 F.3d 671, 676 (7th Cir. 2018) (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323–24 (1992)).

by the party," a judicial admission has the effect of "withdrawing a fact from contention." *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995). One example of a judicial admission is a defendant's answer to a complaint. *See, e.g.*, *Crest Hill Land Dev., LLC v. City of Joliet*, 396 F.3d 801, 805 (7th Cir. 2005). Another, typically, is a response to a request for admission. *See* FED. R. CIV. P. 36(b) (noting that a matter admitted in response to a request for admission is deemed to be "conclusively established").

Although the court takes Raczkowski's admissions into account, it declines to grant them dispositive force. It would be one thing if Raczkowski had *first* made these admissions and *then* sought to unwind his story by introducing contrary evidence through an affidavit or interrogatory response. But the interrogatory response came first in time. In that response, Raczkowski sketched a reasonably thorough picture of the largely informal work arrangement between Union Recycling and each of its Workers. That arrangement plainly does not reflect an employer–employee relationship. For each Worker, Raczkowski stated that that there were no hourly wages (and presumably no salary); no set schedule or mandated hours; no team meetings; no review process; no guarantee of any future work or future use of Raczkowski's property; and no understanding, on the part of either Raczkowski or Union Recycling, that the Worker in question was an "employee" of Union Recycling. He reported that most of the Workers were paid "periodically," if at all. Some of them, he said, worked "at random intervals and on [their] own time."

True, Raczkowski's later admissions appear somewhat incongruous with his earlier response (and with the Workers' affidavits). The court is unsure how to reconcile the two sets of evidence. It keeps in mind, however, the fact that Raczkowski is proceeding pro se. The Supreme Court has long advised that "[a] document filed *pro se* is 'to be liberally construed.'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). The meanings of the statements to which Raczkowski admitted are perhaps clear and self-evident when one understands how those statements are intended to track a specific legal standard, but

the words unquestionably look fuzzier from a lay perspective.  (For instance, what does it mean to "expect[]" one's workers to "repeatedly perform tasks"?)  The court cannot sensibly conclude that Raczkowski's terse admissions must, as a matter of law, resolve the question whether the Workers were employees—because such a resolution would override the substantial, directly contrary evidence contained in Raczkowski's interrogatory response and the Workers' affidavits. The court has pored over the record in detail.  Under these circumstances, the strict enforcement of Rule 36 would defy its sense of fair judgment and subvert its basic interest in the truth-seeking function of litigation.

To the extent Plaintiffs believe that the Audit Policy also provides a reason why this court cannot consider the Workers' affidavits (i.e., a reason independent of Rule 36), the court disagrees.  The Audit Policy provides that (1) Union Recycling (i.e., Raczkowski) "bear[s] the burden of proof with respect to the exclusion of any employee from coverage" under the CBA, and (2) "[a]ffidavits solicited and obtained ex parte by an Employer's Representative from employees, for which there is no corroborative evidence in the form of records maintained in the ordinary course of business," are insufficient to meet that burden.  (Audit Policy § H; *see also* Pls.' SOF ¶ 55.)  As the court reads this language, it concerns the question whether any given Union Recycling employee is covered under the CBA (e.g., based on union membership), but it does not address the *antecedent* question whether a worker is an "employee" in the first place.  Thus, the Audit Policy does not prevent the court from considering the Workers' affidavits in determining their employment status.

The court finds that there remain genuine disputes of material fact about whether the Workers were employees, rather than independent contractors, of Union Recycling.   That conclusion prohibits summary judgment for Plaintiffs.

**<u>CONCLUSION</u>**

Plaintiffs' motion for partial summary judgment [60] is denied. The court again encourages the parties to discuss settlement, and directs them to submit a written status report within 21 days stating their interest, if any, in a conference before the Magistrate Judge.

ENTER:

Dated:  September 26, 2022

_____
REBECCA R. PALLMEYER
United States District Judge